# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **PETER JOE LAWSON,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00030** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

*I. Background and Standard of Review*

Plaintiff, Peter Joe Lawson, ("Lawson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lawson protectively filed his application for DIB on December 3, 2010, alleging disability as of August 27, 2010, due to a back injury, depression, anxiety, bipolar disorder, memory problems, panic attacks, arthritis and severe pain in the knees and legs. (Record, ("R."), at 180, 192, 196, 223-24.) The claim was denied initially and on reconsideration. (R. at 100-04, 106, 108-10.) Lawson then requested a hearing before an administrative law judge, ("ALJ"), (R. at 115), and a hearing was held on December 11, 2012, at which Lawson was represented by counsel. (R. at 28-55.)

By decision dated December 21, 2012, the ALJ denied Lawson's claim. (R. at 15-27.) The ALJ found that Lawson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2014.[1] (R. at 17.) The ALJ also found that Lawson had not engaged in substantial gainful activity since August 27, 2010, his alleged onset date. (R. at 17.) The ALJ found that the medical evidence established that Lawson suffered from severe impairments, namely lumbar spine degenerative disc disease; degenerative joint disease of the bilateral knees; hyperlipidemia; bipolar disorder; generalized anxiety disorder; and

---

[1] In order to be eligible for disability benefits, Lawson must prove disability between August 27, 2010, the alleged onset date, and December 21, 2012, the date of the ALJ's decision.

-2-

major depressive disorder, but he found that Lawson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Lawson had the residual functional capacity to perform a range of simple, routine and repetitive sedentary work[2] in a low-stress environment, which was defined as involving only occasional decision making or changes in the work setting, and which allowed for a sit/stand option every 30 minutes, which did not require him to crawl or to climb ladders, ropes or scaffolds, which did not require more than occasional balancing, stooping, kneeling, crouching or climbing of ramps and stairs, which did not require concentrated exposure to hazardous or moving machinery and unprotected heights, which did not require more than occasional interaction with the public and co-workers, and which would accommodate him being off-task about 10 percent of a normal workday. (R. at 19.) Therefore, the ALJ found that Lawson was unable to perform his past relevant work as a coal miner and cutting machine operator. (R. at 25.) Based on Lawson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Lawson could perform, including jobs as an assembler, a packer and a gate guard. (R. at 25-26.) Thus, the ALJ found that Lawson was not under a disability as defined by the Act and was not eligible for DIB benefits through the date of the decision. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2015).

---

[2] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

After the ALJ issued his decision, Lawson pursued his administrative appeals, (R. at 10-11), but the Appeals Council denied his request for review. (R. at 1-4.) Lawson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Lawson's motion for summary judgment filed January 30, 2015, and the Commissioner's motion for summary judgment filed March 4, 2015.

## II. Facts[3]

Lawson was born in 1970, (R. at 180), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). He has an eleventh-grade education and certification in underground mining. (R. at 31-32, 197.) Lawson has past relevant work experience as a coal miner. (R. at 198.) Lawson testified at his hearing that he had difficulty concentrating due to his anxiety and depression. (R. at 33.) He also stated that he had five to six panic attacks monthly, each lasting for the better part of a day, and which had no specific triggers. (R. at 34-35.) Lawson testified that he took medication for these panic attacks, and when he had one, he would try to read a book and "get [his] mind reeled back in." (R. at 35.) He stated that he spent most of his time at home, noting that he was afraid to be around people and became very nervous in public, which he defined as 15 or more strangers. (R. at 36, 41.) He stated that he could go into

---

[3] Lawson's arguments on appeal are focused solely on his mental impairments and associated limitations. Thus, this court will limit its discussion of the medical records to those pertaining to the same.

grocery stores or other large stores for short periods of time, he participated in some church activities and tried to hunt and fish "a little bit to try to get some exercise and easement of the mind." (R. at 41-42.) Lawson estimated that he had gone hunting only three or four times that year behind his house and for approximately two hours at most. (R. at 42.) He testified that he had a driver's license and drove once or twice weekly for less than 10 miles to pick up a few groceries. (R. at 43.) Lawson stated that his wife took care of the household chores and paid the bills, and his 23-year-old son took care of most of the yard work. (R. at 38-39.)

Martin Kranitz, a vocational expert, also was present and testified at Lawson's hearing. (R. at 45-53.) Kranitz characterized Lawson's past work as a cutting machine operator in an underground coal mine as medium[4] work, but more likely heavy[5] work as it was performed by Lawson. (R. at 45-46.) When asked to consider a hypothetical individual of Lawson's age, limited education and past work experience, who could perform simple, routine, repetitive medium work that required no more than occasional climbing of ladders, ropes or scaffolds and no more than occasional stooping, kneeling, crouching and crawling, that did not require concentrated exposure to hazards like moving machinery and heights, and

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §404.1567(c) (2015).

[5] Heavy work involves items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2015).

-5-

that required no more than occasional interaction with the public or with co-workers, Kranitz testified that such an individual could not perform Lawson's past work as an underground coal miner, but could perform other jobs existing in significant numbers in the national economy, including jobs as a stock selector, a machine feeder and a bus person in a restaurant. (R. at 46-47.) When Kranitz was asked to consider a hypothetical individual who could perform simple, routine, repetitive light[6] work in a low-stress environment, which was defined as involving only occasional decision making or changes in the work setting, but who could never climb ladders, ropes or scaffolds and never crawl, who could occasionally climb ramps or stairs and occasionally balance, stoop, kneel and crouch, who could occasionally interact with the public or with co-workers, who would be off-task about 10 percent of the workday to deal with the effects of both pain and mental limitations and who must avoid concentrated exposure to hazards like moving machinery and heights, Kranitz testified that such an individual could perform the jobs of an assembler, a gate guard and a packer. (R. at 47-48.) Kranitz next was asked to consider the same hypothetical individual, but who could stand or walk for just two hours out of an eight-hour day and sit for up to six hours and who would need a sit/stand option at 30-minute intervals. (R. at 49.) Kranitz testified that such an individual could perform the light jobs enumerated, but in lower numbers. (R. at 49.) Kranitz next was asked to consider the same hypothetical individual, but who likely would be off-task about 20 to 25 percent of the workday, who likely would be absent from work at least twice monthly and who would need

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

-6-

additional breaks each workday to deal with the effects of pain and mental limitations. (R. at 50.) Kranitz testified that such an individual could not perform any jobs. (R. at 50.) Kranitz next testified that, if an individual had no ability to behave in an emotionally stable manner, employment would be precluded if the individual acted in an unstable way during the course of the workday. (R. at 51.) Likewise, Kranitz testified that an individual with no ability to maintain attention or concentration could not work. (R. at 51-52.) Lastly, Kranitz testified that an individual who missed two days or more of work per month would be precluded from employment. (R. at 53.)

In rendering his decision, the ALJ reviewed medical records from Lee County Public Schools; Lee County Community Hospital; Stone Mountain Health Services; Pain Medicine Associates; Holston Medical Group; Dr. James Louthan, M.D.; Indian Path Medical Center; Blue Ridge Internal Medicine; Dr. Uzma Ehtesham, M.D., a psychiatrist; Mountain States Medical Group; Lee Regional Medical Center; East Kentucky Psychological Services; Dr. Kevin Blackwell, D.O.; Robert S. Spangler, Ed.D., a licensed psychologist; Jeanne Buyck, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; and Dr. Richard Surrusco, M.D., a state agency physician.

The record reveals that Lawson saw Dr. Kelly McQueen, D.O., his treating physician, on November 23, 2009, with complaints of depression. (R. at 415-17, 422-24, 538-40.) He requested to restart Cymbalta, stating that he had responded well to it in the past. (R. at 415, 423, 539.) Lawson denied any suicidal, homicidal

-7-

or bizarre thoughts. (R. at 416, 423, 539.) He complained of decreased appetite and sleep, depression, decreased motivation, less enjoyment, crying spells and anxiousness, but no panic attacks. (R. at 416, 423, 539.) Lawson requested a referral to a Christian counselor. (R. at 416, 423, 539.) On physical examination, Lawson's attitude was normal and cooperative with appropriate behavior. (R. at 416, 423, 539.) He was alert, awake and oriented with a depressed mood, but without evidence of anxiety, schizophrenia, personality disorder or other psychiatric disorders. (R. at 416, 423, 539.) There was no evidence of suicidal, homicidal or harmful behavior, judgment was appropriate, and insight was clear with a good understanding of his condition. (R. at 416, 423, 539.) Dr. McQueen diagnosed chronic major depression, and she restarted Cymbalta. (R. at 417, 424, 540.) The referral specialist provided information regarding a Christian counselor, but there is no evidence in the record that Lawson followed through with counseling. (R. at 411, 428, 530.) Lawson returned to Dr. McQueen on June 23, 2010, reporting the recent death of a sister. (R. at 409, 429, 521.) He also reported stopping the Cymbalta, stating that it did not always help him. (R. at 409, 429, 521.) Lawson reported continued highs and lows, but denied suicidal thoughts or plans. (R. at 409, 429, 521.) He reported both anxiety and depressive symptoms. (R. at 409, 429, 521.) Lawson was fully oriented, but tearful, his attitude was normal, and he had no suicidal tendencies or homicidal ideation. (R. at 410, 430, 522.) Dr. McQueen diagnosed chronic major depression and prescribed Cymbalta. (R. at 410, 430, 522.) She discussed the need for Lawson to see a psychiatrist due to his never having benefitted from any medication and her opinion that he might have bipolar disorder. (R. at 410, 430, 522.) She referred him to Dr. Somiah. (R. at 410, 430, 522.)

-8-

On September 1, 2010, Lawson reported not doing well and that he had not seen the psychiatrist because he did not take insurance. (R. at 404, 431, 515.) He was fully oriented with a blunted, flat, sad, tearful and worried affect. (R. at 405, 432, 516.) His attitude was normal, and he had no suicidal tendencies or homicidal ideations. (R. at 405, 432, 516.) Dr. McQueen diagnosed bipolar disorder, she discontinued Cymbalta and prescribed Symbyax. (R. at 404-05, 431-32, 515-16.) She discussed the urgent need for Lawson to see a psychiatrist. (R. at 406, 433, 517.) On September 10, 2010, Lawson reported continued depression. (R. at 396, 438, 505.) He reported going to Dr. Somiah's office, but again was told they did not take his insurance. (R. at 396, 438, 505.) Lawson's attitude was normal, and his affect was blunted, flat and tearful, but he had no suicidal tendencies or homicidal ideation. (R. at 397, 439, 506.) Dr. McQueen diagnosed chronic major depression and prescribed Cymbalta. (R. at 397, 439, 506.) She again urged Lawson to see a psychiatrist for treatment of possible bipolar disorder. (R. at 397, 439, 506.) On September 14, 2010, Dr. McQueen requested a psychiatry consult. (R. at 394, 443, 502.) On September 27, 2010, Lawson noted slight improvement in his depression. (R. at 388, 445, 496.) He was fully oriented with a sad, tearful and worried affect, but he had a normal attitude with no suicidal tendencies or homicidal ideation. (R. at 390, 447, 498.) Dr. McQueen diagnosed bipolar disorder and again requested a psychiatry consult. (R. at 390, 447, 498.)

The record reveals that Lawson saw Dr. Uzma Ehtesham, M.D., a psychiatrist, on a monthly basis for approximately two years, from November 15, 2010, to December 10, 2012. On November 15, 2010, he complained of depression and mood swings, excessive worry, sadness, low self-esteem, hopelessness, agitation, racing thoughts, decreased sleep, impulsivity, paranoia and visual

-9-

hallucinations. (R. at 570.) He reported that his depression started "a while ago" and had worsened. (R. at 570-71.) Lawson reported that he had seen a counselor and had taken Symbyax, Cymbalta, Zoloft and Paxil. (R. at 571.) On mental status examination, Lawson's hygiene and grooming were good, he maintained eye contact, his speech was normal, and he exhibited normal motor activity. (R. at 573.) His affect was flat, anxious, agitated and irritable with congruent mood and thoughts. (R. at 573.) He exhibited excessive worry and anticipatory anxiety, but he denied suicidal or homicidal ideations. (R. at 573.) No delusions were elicited, there was no evidence of mania, and Lawson did not appear to be responding to internal stimuli. (R. at 573.) Lawson reported hallucinations, but he was fully oriented, his thought processes were goal-oriented, his insight was good, and his judgment was intact. (R. at 573.) Dr. Ehtesham diagnosed Lawson with severe, recurrent major depressive disorder with psychotic behavior, and she assessed his then-current Global Assessment of Functioning, ("GAF"),[7] score at 56.[8] (R. at 575.) She decreased his dosage of Symbyax and prescribed Lithium. (R. at 575.) On November 29, 2010, he reported less anger and less mind racing. (R. at 568.) His anxiety was rated as a three on a 10-point scale. (R. at 568.) He denied hallucinations, and no attention symptoms were noted. (R. at 568.) Eye contact was intermittent, and speech was spontaneous. (R. at 568.) Lawson's affect was anxious and agitated with congruent mood. (R. at 568.) He denied suicidal or homicidal ideation, no delusions were elicited, and there was no evidence of

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32

-10-

mania. (R. at 568.) Lawson's insight was fair/poor, and his judgment was intact/improved. (R. at 568.) Dr. Ehtesham prescribed Vistaril, Lithium and Geodon. (R. at 568-69.)

When Lawson returned to Dr. McQueen on December 8, 2010, she noted that he had been taking Geodon and Lithium and was more stable and feeling better, but did "not want to admit it," as he had filed for disability. (R. at 551, 584.) It was noted that he "still [had] bad days, but they [were] manageable." (R. at 551, 584.) On physical examination, Lawson was awake, alert and fully oriented with an improved mood. (R. at 552, 585.) Dr. McQueen noted that Lawson was actually smiling and not tearful, and she described his affect as "almost content." (R. at 552, 585.) She recommended that Lawson continue psychiatric treatment and medications. (R. at 552, 585.)

Lawson returned to Dr. Ehtesham in December 2010 and January 2011. During this time, he reported that his depression was improving, he was less sad and anxious, and he experienced fewer mood swings. (R. at 564, 566.) His depression was rated as a three and his mania as a three to four. (R. at 564, 566.) Eye contact was intermittent, and Lawson's affect was anxious and agitated with congruent mood. (R. at 564, 566.) No delusions were elicited, and there was no evidence of mania. (R. at 564, 566.) Lawson's insight was deemed fair/poor, while his judgment was intact/improved. (R. at 564, 566.) In January 2011, although Lawson reported paranoia, his thought processes were goal-oriented. (R. at 564.) Dr. Ehtesham continued him on Vistaril, Lithium and Geodon during this time. (R. at 564, 567.)

-11-

When Lawson returned to Dr. McQueen on January 19, 2011, she noted that he was seeing a psychiatrist for treatment of bipolar disorder. (R. at 549, 580, 724.) He was awake, alert and fully oriented at that time. (R. at 550, 581.)

On January 31, 2011, Dr. Ehtesham completed a Mental Status Evaluation Form of Lawson, stating that he experienced mood swings and anger problems and that he isolated himself. (R. at 559-63.) She described him as cooperative, fully oriented and sad with fair memory and illogical thought content, confusion at times, decreased concentration, persistence and task completion, a concrete thinker with poor judgment and becoming irritable under stress. (R. at 561-62.) Dr. Ehtesham did not offer any diagnosis. (R. at 559.) Lawson continued to treat with Dr. Ehtesham from February through April 2011. Over this time, he reported improvement in his depression, mood swings and anger, but a decreased ability to focus. (R. at 606, 608, 610, 612.) His depression was rated from a four to a six during this time, his anxiety a three to an eight and his mania a five. (R. at 606, 608, 610, 612.) On February 21, 2011, Lawson endorsed auditory hallucinations and racing thoughts. (R. at 612.) However, by March and April 2011, he denied hallucinations, and no attention symptoms were noted. (R. at 606, 610.) Lawson's affect was consistently described as anxious with congruent mood. (R. at 606, 608, 610, 612.) Lawson also consistently denied suicidal or homicidal ideation, he exhibited intermittent eye contact and spontaneous speech, his insight was fair/poor, and his judgment was intact/improved. (R. at 606, 608, 610, 612.) Dr. Ehtesham continued to treat Lawson with medications during this time, including Lithium, Vistaril, Geodon, Klonopin and Lamictal. (R. at 606-13.)

When Lawson saw Dr. McQueen on April 18, 2011, she noted that he was

awake, alert, fully oriented, pleasant and cooperative. (R. at 578-79.)

Lawson continued treating with Dr. Ehtesham in May and June 2011. On May 3, 2011, he reported that his anger, depression and anxiety all were decreasing, and his anxiety was rated a five. (R. at 604.) By May 19, 2011, he reported increased depression and continued mind racing, and his anxiety was rated an eight and his depression a four. (R. at 602.) On June 17, 2011, Lawson reported improving depression, and his anxiety was rated a five and his depression a three. (R. at 600.) During this time, Lawson denied hallucinations, he denied suicidal or homicidal ideations, he displayed intermittent eye contact and spontaneous speech, and no attention symptoms were noted. (R. at 600, 602, 604.) Lawson's insight was deemed to be fair/poor and his judgment intact/improved. (R. at 600, 602, 604.) Dr. Ehtesham continued to describe Lawson's affect as anxious with congruent mood, and she continued to treat him with medications. (R. at 600-05.)

On June 16, 2011, Dr. Ehtesham completed a Mental Status Evaluation Form of Lawson for the period covering November 15, 2010, through June 16, 2011. (R. at 595-99.) She noted that Lawson had depression and mood swings with a tendency toward anger. (R. at 595-96.) Dr. Ehtesham described Lawson as cooperative and fully oriented with an irritable mood and affect, decreased memory, illogical thought content and organization, confusion, decreased concentration, decreased judgment and limited fund of information. (R. at 597-98.) She noted that Lawson became angry when under stress. (R. at 598.) Dr. Ehteshem diagnosed Lawson with severe, recurrent major depressive disorder with psychotic behavior. (R. at 595.)

-13-

Lawson returned to Dr. Ehtesham in July and August 2011, reporting severe and intensifying depression, paranoia and becoming nervous more easily. (R. at 639, 641, 643.) However, on July 15, 2011, he reported the recent death of his father. (R. at 643.) His anxiety was rated a five and his depression an eight. (R. at 643.) On August 3, 2011, Lawson's depression was rated an eight, and on August 29, 2011, his anxiety was rated a five and his depression a three. (R. at 639, 641.) Over this time, Dr. Ehtesham noted that Lawson had intermittent eye contact, spontaneous speech and no attention symptoms. (R. at 639, 641, 643.) He denied suicidal or homicidal ideation, no delusions were elicited, and there was no evidence of mania. (R. at 639, 641, 643.) On August 3 and August 29, 2011, Lawson specifically denied hallucinations. (R. at 639, 641.) His affect was consistently anxious with congruent mood, his insight was fair/poor, and judgment was intact/improved. (R. at 639, 641, 643.) During this time, Dr. Ehtesham prescribed Haldol and Celexa, increased Lawson's Lithium dosage and continued him on Klonopin and Lamictal. (R. at 639-44.)

When Lawson returned to Dr. McQueen on August 18, 2011, she noted that Lawson was seeing a psychiatrist and feeling better. (R. at 713.) His "active problem" list included bipolar disorder, most recent episode, depressed, mild. (R. at 714.) Lawson was alert and fully oriented at that time. (R. at 714-15.) He again saw Dr. McQueen on October 4, 2011, at which time Lawson continued to be alert and fully oriented. (R. at 711.) Dr. McQueen noted his diagnosis of bipolar disorder, most recent episode depressed, mild. (R. at 710.)

Lawson continued treating with Dr. Ehtesham in September and October 2011. During this time, Lawson reported severe depression, anxiety, panic, mania

-14-

and feeling more nervous throughout the day. (R. at 637, 669.) On September 28, 2011, Dr. Ehtesham rated Lawson's anxiety as an eight. (R. at 637.) However, Lawson reported he had run out of Haldol. (R. at 637.) At that time, he also endorsed agitation, paranoia and auditory and visual hallucinations. (R. at 637.) Eye contact was intermittent, and no attention symptoms were noted. (R. at 637.) By October 19, 2011, Lawson maintained eye contact, and he denied delusions or hallucinations. (R. at 669, 672.) Lawson's insight was good, judgment was intact, thought processes were goal-oriented, and he was fully oriented. (R. at 672.) Dr. Ehtesham diagnosed Lawson with severe, recurrent major depressive disorder with psychotic behavior, and she assessed his then-current GAF score as 58. (R. at 674.) Over this time, Lawson denied suicidal and homicidal ideation, no delusions were elicited, and there was no evidence of mania. (R. at 637, 672.) His affect was anxious with congruent mood. (R. at 637, 672.) Dr. Ehtesham continued Lawson on medication. (R. at 637-38, 674.)

On October 28, 2011, Dr. Ehtesham completed a work-related mental assessment, finding that Lawson had a seriously limited ability to follow work rules and to understand, remember and carry out complex job instructions. (R. at 645-47.) She found that Lawson had no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both simple and detailed job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 645-46.) Dr. Ehtesham based these findings on Lawson's severe psychosis with bipolar disorder and severe panic attacks. (R. at 645-46.) She opined that Lawson would miss more

-15-

than two days of work monthly due to his impairments or treatment. (R. at 647.)

Lawson continued treating with Dr. Ehtesham from November 18, 2011, to January 17, 2012. Over this time, Lawson's condition remained fairly consistent, with less depression and no panic symptoms. (R. at 663, 667.) His anxiety was rated between a three and a five, and his depression was rated a four. (R. at 663, 665, 667.) Lawson reported sadness, agitation and paranoia, but he denied hallucinations and attentions symptoms, eye contact was intermittent, and speech was spontaneous. (R. at 663, 665, 667.) He denied suicidal or homicidal ideation, no delusions were elicited, and no mania was noted. (R. at 663, 665, 667.) Dr. Ehtesham described Lawson's affect as anxious with congruent mood, his insight was fair/poor, and his judgment was intact/improved. (R. at 665, 667.) She continued him on Lithium, Celexa, Lamictal and Haldol. (R. at 663, 668.)

On December 15, 2011, Lawson returned to Dr. McQueen with no complaints of anxiety or depression. (R. at 707.) He was alert and fully oriented. (R. at 708-09.) Dr. McQueen described Lawson's mood as improved since seeing the psychiatrist, but she noted that he had a flat affect. (R. at 709.)

Lawson continued to treat with Dr. Ehtesham from February 15 through April 12, 2012. In February and March 2012, Lawson reported less depression, but increased anger and some confusion. (R. at 659, 661.) His anxiety was rated between a five and an eight. (R. at 659, 661.) Lawson reported sadness, agitation and paranoia, but he denied panic symptoms, delusions, hallucinations and attention symptoms. (R. at 659, 661.) He denied suicidal or homicidal ideation, no delusions were elicited, and there was no evidence of mania. (R. at 659, 661.)

-16-

Lawson exhibited intermittent eye contact and spontaneous speech. (R. at 659, 661.) Dr. Ehtesham described his affect as anxious with congruent mood, and he had fair/poor insight and intact/improved judgment. (R. at 659, 661.) By April 12, 2012, Lawson reported both increased anger and depression. (R. at 657.) His anxiety was rated an eight and his depression a three. (R. at 657.) Lawson reported panic symptoms, including trembling, chest pain and nausea, as well as sadness, agitation and paranoia. (R. at 657.) He denied hallucinations and attention symptoms, eye contact was intermittent, and speech was spontaneous. (R. at 657.) Lawson had no suicidal or homicidal ideation, and no delusions were elicited. (R. at 657.) Insight was fair/poor, judgment was intact/improved, and thought processes were goal-oriented. (R. at 657.) Over this time, Dr. Ehtesham continued Lawson on medications. (R. at 657-61.)

On April 24, 2012, Lawson reported no anxiety or depression to Dr. McQueen. (R. at 704.)

Dr. Ehtesham continued to treat Lawson from June 13 to August 14, 2012. In June 2012, he reported less depression, while in August 2012, he reported worsened depression. (R. at 648, 654.) During this time, Lawson's anxiety was rated between a three and a four, his depression a five and his bipolar symptoms a two. (R. at 648-49, 654.) Lawson endorsed excessive worry, agitation, poor concentration, heart palpitations, irritability, restlessness, trembling, chest pain, nausea, sadness, excessive guilt, paranoia, fatigue and hopelessness. (R. at 648-49, 654.) He denied hallucinations and attention symptoms, as well as suicidal or homicidal ideations. (R. at 649, 654.) No delusions were elicited, and there was no evidence of mania. (R. at 649, 654.) In June 2012, eye contact was intermittent, but

-17-

in August 2012, Lawson was able to maintain eye contact. (R. at 649, 654.) His speech was spontaneous and normal. (R. at 649, 654.) In June 2012, Lawson's affect was anxious with congruent mood, and in August 2012, it was anxious, flat, blunted and hypomanic with congruent mood. (R. at 649, 654.) Nonetheless, in August 2012, Dr. Ehtesham deemed Lawson's insight to be good, and she noted that his thought processes were goal-oriented. (R. at 649.) She described his then-current level of functioning as "good," and she placed his then-current GAF score at 51-60. (R. at 648, 650.) Dr. Ehtesham diagnosed Lawson with severe, recurrent major depressive disorder with psychosis and continued him on medications. (R. at 648, 654-55.)

On August 23, 2012, Lawson again reported no anxiety or depression to Dr. McQueen. (R. at 701.)

Lawson saw Dr. Ehtesham on July 13, 2012, with complaints of increased mood cycling. (R. at 651.) His reported symptoms included excessive worry, irritability, sadness, increased anger, increased paranoia and decreased attention span. (R. at 651-52.) However, Lawson reported no panic, and he denied delusions, hallucinations, attention symptoms and suicidal or homicidal ideation. (R. at 651-52.) Lawson maintained eye contact, and speech was normal. (R. at 652.) His affect was anxious with congruent mood. (R. at 652.) No delusions were elicited, and there was no evidence of mania. (R. at 652.) Lawson's insight was good, and his thought process was goal-oriented. (R. at 652.) Dr. Ehtesham noted that Lawson was compliant with treatment, and she deemed his then-current level of functioning as "good." (R. at 652-53.) Lawson's diagnosis and GAF score remained unchanged, as did his medications. (R. at 651, 653.)

-18-

Dr. Ehtesham completed another work-related mental assessment on September 13, 2012, finding that Lawson had a seriously limited ability to interact with supervisors, to understand, remember and carry out detailed job instructions and to behave in an emotionally stable manner. (R. at 676-78.) In all other areas of work-related mental functioning, Dr. Ehtesham found that Lawson had no useful ability. (R. at 676-77.) She based her findings on Lawson's severe anxiety, severe psychosis with depression, memory problems and severe panic attacks. (R. at 676-77.) Dr. Ehtesham further opined that Lawson had severe anger and mood swings resulting in no ability to work. (R. at 678.) She opined that he would miss more than two workdays monthly due to his impairments or treatment. (R. at 678.)

Lawson continued seeing Dr. Ehtesham from October 11 through December 5, 2012. (R. at 679-86.) Over this time, Lawson continued to complain of depression, anxiety, panic symptoms and bipolar symptoms. His anxiety was consistently rated as a three, his depression between a three and a four, his bipolar symptoms as a three and his mania as a five. (R. at 679, 681-82, 684.) In October 2012, Lawson complained of a few days of increased depression, but he denied hallucinations, and no attention symptoms were noted. (R. at 679.) In November 2012, Lawson complained of anxiety, depression and bipolar symptoms, but denied panic symptoms. (R. at 681-82.) He denied delusions, hallucinations and attention symptoms, but reported increased paranoia. (R. at 682.) Over this time, Lawson's affect was anxious with congruent mood, and there was no evidence of mania. (R. at 679, 682.) Eye contact was either intermittent or maintained, and speech was spontaneous and normal. (R. at 679, 682.) In October 2012, Lawson's insight was fair/poor, and his judgment was intact/improved. (R. at 679.) In November 2012, his insight was deemed "good," and his thought processes were

-19-

goal-oriented. (R. at 682.) Dr. Ehtesham rated Lawson's then-current level of functioning as "good." (R. at 683.) She diagnosed him with severe, recurrent major depressive disorder with psychosis, and she placed his then-current GAF score at 51-60. (R. at 681.) Over this time, Dr. Ehtesham continued Lawson on medications, increasing his Klonopin dosage. (R. at 679-83.) By December 5, 2012, Lawson's reported symptoms included heart palpitations, trembling and fear of losing control. (R. at 684.) He denied delusions, hallucinations and attention symptoms, as well as suicidal or homicidal ideation. (R. at 685.) Despite these notations, this treatment note proceeds to state that Lawson reported increased auditory and visual hallucinations, increased paranoia and decreased attention span and focus. (R. at 685.) Lawson's affect was anxious with congruent mood. (R. at 685.) There was no evidence of mania, insight was fair, and thought processes were goal-oriented. (R. at 685.) Lawson's diagnosis and GAF score remained unchanged, and Dr. Ehtesham continued him on medications. (R. at 684.)

Dr. Ehtesham completed a third work-related mental assessment of Lawson on December 10, 2012, finding that he was seriously limited in his ability to deal with work stresses and to understand, remember and carry out detailed job instructions. (R. at 697-99.) She further found that Lawson had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention / concentration, to understand, remember and carry out both simple and complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 697-98.) Dr. Ehtesham based her opinions on Lawson's severe bipolar disorder with psychosis, his difficulty finishing work and his severe panic attacks and anger

-20-

problems. (R. at 697-98.) She further opined that Lawson would be absent from work more than two days monthly due to his impairments or treatment. (R. at 699.)

Lawson was seen at Pain Medicine Associates from October 8, 2010, through February 24, 2011, for problems associated with his back. (R. at 339-45, 358-60, 482, 576.) However, these notes contain some references to Lawson's mental status. On October 8, 2010, Lawson reported that his back impairment had caused feelings of depression, irritability, anger and thoughts of suicide. (R. at 358.) He endorsed an anxiety disorder, depression, nervous tension and nervous exhaustion, among other things. (R. at 359.) Over this time, he was described as fully oriented with clear and articulate speech with an appropriate mood and affect to the situation. (R. at 341, 344-45, 353, 356, 365, 378, 382, 452, 454, 459, 462, 485, 490, 576.) Lawson was diagnosed with history of anxiety/depression per patient report and a history of nervous tension and nervous exhaustion per patient report. (R. at 339, 341-42, 344, 347, 349-50, 352, 354, 366, 368-69, 371-72, 376, 378-79, 381, 383, 455, 457, 459-60, 462, 482-83, 485-86, 488, 491, 576.) On October 13, 2010, Lawson was described as very pleasant, fully alert and oriented with clear and articulate speech with an appropriate affect, but becoming tearful from time to time during the conversation. (R. at 356, 363, 385, 452, 493.)

Jeanne Buyck, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on March 15, 2011, in connection with Lawson's initial disability claim. (R. at 65.) She concluded that Lawson was mildly restricted in his activities of daily living, had moderate difficulties maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at

-21-

65.) Buyck also completed a mental residual functional capacity assessment of Lawson, finding that he was moderately limited in his abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behaviors and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 69-71.) Buyck concluded that Lawson was capable of performing simple, unskilled routine work with limited contact with the public. (R. at 71.) She noted that when Lawson was not on his medications for bipolar disorder and anxiety, he began to cycle rapidly into manic-like episodes and, even when medication-compliant, he remained symptomatic, but showed overall improvement compared to baseline. (R. at 71.) It was concluded that, while Lawson had depression, anxiety, panic attacks and bipolar disorder, the evidence showed that, with proper treatment, his condition should continue to improve and that he could perform work that did not require a great deal of contact with other people. (R. at 74.)

Lawson saw Phil Pack, M.S., a licensed psychological practitioner, on July 23, 2011, for a psychological evaluation at the request of Disability Determination Services. (R. at 622-29.) Pack noted Lawson's desire to impress upon him the

-22-

severity of his symptoms and difficulties and his reasons for not being able to continue employment. (R. at 623.) He described recurrent bouts of depression that had been going on for a number of years, in addition to chronic symptoms of mood swings, which, at times, included psychotic processes such as auditory perceptual disturbances. (R. at 623.) Specifically, Lawson recounted incidences of hearing voices or having unusual obsessive-compulsive type thoughts about injuring himself or other people and incidences of becoming extremely angry. (R. at 623-24.) Lawson reported that medication had been helpful. (R. at 624.) He stated that he continued to occasionally have perceptual disturbances and occasional obsessive thoughts and beliefs that he was going to hurt someone. (R. at 624.)

Lawson reported that he drove short distances around home. (R. at 625.) He also reported attending church, which he felt helped him control his thoughts. (R. at 625.) Lawson stated that he talked with his mother on the phone daily, and he was able to keep up with his own mail and appointments, as well as tend to his own self-care without difficulty. (R. at 626.) Lawson's speech was clear, and he maintained appropriate eye contact. (R. at 626.) He was fully oriented, and sensorium was intact, as were general cognitive and memory functions. (R. at 626.) Lawson's mood was generally pleasant, and his affect was described as broadened. (R. at 626.) Pack diagnosed Lawson with bipolar disorder, not otherwise specified, with psychotic features; polysubstance dependence, in full sustained remission; and obsessive-compulsive disorder, ("OCD"); and he assessed his then-current GAF score at 45.[9] (R. at 627.) He indicated that Lawson had stabilized with treatment, although he continued to present with residual depressive and OCD

_____

[9] A GAF score of 41-50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

-23-

behavior. (R. at 628.) Pack opined that Lawson's general stress tolerance was poor, and his prognosis was guarded to fair, as long as he maintained long-term psychiatric treatment for stabilization of his issues. (R. at 628.) Pack concluded that Lawson's ability to perform detailed and complex tasks, versus simple and repetitive tasks, was more than satisfactory, his general cognitive and memory processes were not limited by a mental impairment, his ability to maintain regular attendance in the workplace, perform work activities on a consistent basis and without special or additional supervision was seriously limited, but not precluded, and his abilities to accept instructions from a supervisor and to deal with co-workers and the general public were seriously limited, but not precluded. (R. at 628.)

On August 1, 2011, Lawson saw Dr. Kevin Blackwell, D.O., for a consultative physical evaluation at the request of Disability Determination Services. (R. at 632-35.) During the course of this evaluation, Dr. Blackwell indicated that Lawson was alert, cooperative and fully oriented with good mental status. (R. at 633.) His affect, thought content and general fund of knowledge appeared intact. (R. at 633.)

Louis Perrott, Ph.D., another state agency psychologist, completed a PRTF on August 22, 2011, in connection with the reconsideration of Lawson's disability claim. (R. at 86.) Perrott found that Lawson was mildly restricted in his activities of daily living, experienced moderate difficulties maintaining social functioning and in maintaining concentration, persistence or pace and that he had experienced no repeated episodes of decompensation of extended duration. (R. at 86.) Perrott also completed a mental residual functional capacity assessment of Lawson,

-24-

finding that Lawson was moderately limited in all of the same areas as psychologist Buyck had found previously. (R. at 90-92.) Like state agency psychologist Buyck, Perrott concluded that Lawson was capable of performing simple, unskilled routine work with limited contact with the public and co-workers. (R. at 92.) It was concluded that, while Lawson may occasionally feel nervous and depressed, the evidence indicated that he was able to perform daily activities without severe limitations, and he had a good ability to perform simple or less skilled work without significant cognitive impairment. (R. at 95-96.)

Lawson saw Robert S. Spangler, Ed.D., a licensed psychologist, on December 4, 2012, for a consultative psychological evaluation at the request of his attorney. (R. at 688-91.) He reported driving locally twice weekly to the store or other short trips. (R. at 688.) Lawson was cooperative, seemed socially confident, anxious and depressed during the interview. (R. at 688.) He described classic depressive symptoms, as well as anxiety. (R. at 688.) Lawson generally understood the instructions for each task, and he demonstrated good concentration. (R. at 688.) Lawson appeared to do his best on all tasks, but was slow secondary to pain and depressive symptoms. (R. at 688.) He was appropriately persistent on the tasks, but pace was impacted. (R. at 688.) Lawson reported becoming "real nervous in public if there is a crowd." (R. at 688.) He reported that he had about five manic episodes monthly with angry outbursts, and he reported seeing and hearing things.  (R. at 689.)

On mental status examination, Lawson was alert with adequate recall of remote events, but inadequate recall of recent events. (R. at 689.) His mood was depressed and anxious with congruent affect, he was cooperative, compliant and

-25-

forthcoming. (R. at 689.) There was no illogical language or loose associations, and his judgment and insight were consistent with low average intelligence. (R. at 689.) Lawson reported experiencing auditory and visual hallucinations once weekly, including hearing people whining and seeing faces on the wall. (R. at 690.) He also admitted anger during manic episodes. (R. at 690.) Delusional thought was not evident. (R. at 690.) Lawson reported attending church weekly, when possible, and watching television, but he reported that his mind raced. (R. at 690.) Spangler deemed Lawson's social skills adequate, and he related well to him. (R. at 690.) Spangler found Lawson to be credible. (R. at 690.)

Spangler administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), the results of which were deemed valid. (R. at 690.) Lawson's full-scale IQ score was assessed at 82, placing him in the low average range of intelligence. (R. at 691.) Spangler also administered the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), on which Lawson tested in the eighth-grade level in word reading, the twelfth-grade level in sentence comprehension and in the eighth-grade level in arithmetic computation. (R. at 691.) The Bender Visual Motor Gestalt Test did not indicate the presence of organicity. (R. at 691.) However, Lawson's pace was inadequate as objectively tested. (R. at 691.) Spangler diagnosed Lawson with polysubstance dependence in full remission; bipolar 1 disorder, currently diagnosed, moderate on prescriptions; general anxiety disorder, moderate on prescriptions; major depressive disorder, recurrent, severe with psychotic features; cognitive disorder, not otherwise specified; low average intelligence; and a GAF score of 50. (R. at 691.) Spangler's prognosis for Lawson was guarded, and he opined that Lawson needed continued mental health treatment with Dr. Ehtesham for a period to exceed 12 months. (R. at

-26-

691.)

Spangler also completed a work-related mental assessment on December 4, 2012, finding that Lawson had a limited, but satisfactory, ability to maintain attention and concentration when taking medications. (R. at 693-95.) He found that Lawson had a seriously limited ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently and to maintain personal appearance. (R. at 693-94.) Spangler found that, on good days, Lawson had a seriously limited ability to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 694.) He found that Lawson had no useful ability to deal with the public, to deal with work stresses and to understand, remember and carry out both detailed and complex job instructions. (R. at 693-94.) Spangler also found that, on bad days, Lawson had no useful ability to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 694.) Spangler based these findings on Lawson's low average intelligence; cognitive disorder; limited education; slowed pace; major depressive disorder, recurrent, severe with psychotic features on medications; generalized anxiety disorder, moderate on medications; and bipolar 1 disorder, depressed currently, moderate on medications. (R. at 694-95.) He further opined that Lawson's severe, recurrent major depressive disorder with psychotic features impacted all work-related activities significantly, especially the ability to deal with work stress and reliability. (R. at 695.) Spangler stated that Lawson met or equaled §12.02, the medical listing for organic mental disorders, if etiology was clarified. (R. at 695.) He opined that Lawson could not manage benefits in his own

-27-

best interest and that he would be absent from work more than four days monthly due to his mental impairments or treatment. (R. at 695.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the

-28-

medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4ᵗʰ Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4ᵗʰ Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Lawson argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Lawson also argues that the ALJ erred by improperly determining his mental residual functional capacity. (Plaintiff's Brief at 6-8.) The court, sua sponte, raises the issue whether the ALJ erred in his reliance on the vocational expert's testimony in finding that a significant number of jobs exist in the national economy that Lawson can perform, thereby making him ineligible for disability benefits.

I first find Lawson's argument that the ALJ erred by making incomplete findings at step three of the sequential evaluation process unpersuasive. Specifically, Lawson argues that the ALJ failed to adequately explain the basis for his finding that the "paragraph B" criteria, necessary for a finding that a claimant's mental impairment meets or equals a medical listing, were not met. He argues that the ALJ is required to provide findings in the decision that are essential to the sequential evaluation process because, without such, a meaningful review of the decision is impossible. Lawson does not direct the court to a specific medical

-29-

listing, but, in his decision, the ALJ stated that he was considering § 12.04 and § 12.06, the medical listings for affective disorders and anxiety-related disorders, respectively. Under the regulations, to meet the "paragraph B" criteria for such listings at step three of the sequential process, two of the following requirements must be met:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B) (2015). The ALJ found that the medical evidence established that Lawson had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and that he had experienced no episodes of decompensation of extended duration. (R. at 18.)

In his decision, the ALJ specifically stated that Lawson participates in some activities that seem to show that he is capable of more than he claims, including hunting, fishing, attending church services weekly and occasionally driving to the store. (R. at 19-20, 23.) The ALJ further stated that Lawson could keep up with his mail and his medical appointments. (R. at 23.) The ALJ also noted Lawson's hearing testimony that he often read. (R. at 19.) Lastly, the ALJ stated in his decision that Lawson did not attend counseling and had never been psychiatrically hospitalized. (R. at 23.) I find that such findings by the ALJ adequately explain his

-30-

conclusion that Lawson's mental impairments did not meet the "paragraph B" criteria.

Next, Lawson argues that the ALJ erred in his mental residual functional capacity finding. I agree, but on slightly different grounds than argued by Lawson. While Lawson simply argues that the ALJ should have given more weight to the opinions of his treating psychiatrist, Dr. Ehtesham, and consultative psychological examiners Pack and Spangler, instead of relying on the opinions of state agency psychologists Buyck and Perrott, I find that the ALJ erred by failing to explicitly state the weight given to Dr. Ehtesham's opinions. It is well-settled that "the [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). In his decision, the ALJ never explicitly stated the weight he was giving to Dr. Ehtesham's opinions. He noted that some of her findings were illogical and that her opinions were inconsistent with her treatment notes. However, he did not state whether he was giving her opinions no weight, little weight, some weight or some other designation. In contrast, the ALJ did explicitly state the weight that he was giving to the other psychological sources contained in the record. All of this being the case, because the ALJ did not explicitly indicate the weight given to all relevant evidence, I cannot determine if the findings are

-31-

supported by substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Lastly, the court raises, sua sponte, as it may,[10] the issue of whether the ALJ erred in his reliance on the vocational expert's testimony in finding that a significant number of jobs exist in the national economy that Lawson could perform, thereby making him ineligible for disability benefits. I find that he did so err. Residual functional capacity refers to the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c) (2015). Here, the ALJ concluded that Lawson retained the functional capacity to perform a range of sedentary work and that he could perform the jobs of an assembler, a packer and a gate guard, which, in his decision, he represented were classified as sedentary level work. (R. at 26.) However, at the hearing, the vocational expert had explicitly clarified that these jobs were classified as light level work upon questioning by the ALJ. In particular, the following exchange between the ALJ and the vocational expert, ("VE"), occurred:

> ALJ: Let's take that second hypothetical in its entirety. Let's just make one change. And that one change is that the individual could stand or walk for just 2 hours out of an eight-hour day. He could sit for up to six hours. And the individual would need a sit/stand option at 30-minute intervals. …
> VE:  I believe that the jobs[11] which I've mentioned would exist, but

---

[10] In *Ricks v. Cmr. of Soc. Sec.*, 2010 WL 6621693, at *7 (E.D. Va. Dec. 29, 2010), the court further held that, especially given the nonadversarial nature of social security disability cases, it could not ignore obvious and prejudicial errors, even if the litigants did not identify and debate them.

[11] The jobs to which the VE is referring are an assembler, a gate guard and a packer.  (R.

-32-

in lower numbers.

ALJ:  Okay the jobs you gave me in hypo two are light jobs.  So these would be sedentary jobs, then, as an assembler?

VE:    No.   These would be light jobs that would allow sitting or standing.

ALJ:  Oh, I see.  Okay.  So that –

VE:    So that the only adjustment to the hypothetical was that it was a stand – it was two, instead of six hours.

ALJ:  Oh, that's right.

VE:    [INAUDIBLE] sit/stand option, so –

ALJ:  That's correct.

VE:    I'm anticipating that the person could still, theoretically, lift 20 pounds, but may do it from a sitting position if necessary.

(R. at 49-50.)

Furthermore, testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all of the evidence of record and is in response to proper hypothetical questions which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: (1) is the ALJ's finding as to the claimant's residual functional capacity supported by substantial evidence; and (2) does the hypothetical fairly set forth the residual functional capacity as found by the ALJ?  The Commissioner may not rely upon the answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979). This is precisely the case here, as the ALJ found that Lawson could perform sedentary work with certain restrictions. However, the vocational expert was never presented with a

at 48.)

-33-

hypothetical question setting forth the residual functional capacity for sedentary work. Additionally, the jobs that the ALJ found existed in significant numbers in the national economy that Lawson could perform were actually classified as light jobs by the vocational expert, not sedentary, as the ALJ represented in his decision. Given these circumstances, I cannot find that substantial evidence exists to support the ALJ's residual functional capacity finding and his ultimate conclusion that Lawson is not entitled to disability benefits.

Based on the above-stated reasons, I find that substantial evidence does not support the ALJ's decision denying benefits. I will deny both motions for summary judgment, vacate the decision denying benefits and remand Lawson's claim to the Commissioner for further development. An appropriate order and judgment will be entered.

ENTERED: February 24, 2016.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-34-